**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| HDI GERLING INDUSTRIE VERSICHERUNG AG; XL SPECIALTY INSURANCE COMPANY; AXIS INSURANCE COMPANY; B.D.M. NV; and ACE EUROPEAN GROUP, LTD., | Civil Action No.: 14-cv-2571 (CCC) |
| Plaintiffs, | **OPINION** |
| v. | |
| CONTINENTAL TERMINALS, INC. and RTC PROPERTIES, INC., | |
| Defendants. | |
| ROYAL & SUN ALLIANCE INSURANCE, PLC | |
| Plaintiff, | Civil Action No.: 16-cv-325 (CCC) |
| v. | |
| CONTINENTAL TERMINALS, INC. and RTC PROPERTIES, INC., | |
| Defendants. | |

**CECCHI, District Judge.**

## I.    <u>INTRODUCTION</u>

This matter comes before the Court by way of three motions: first, Defendant RTC Properties, Inc. ("RTC") moves for summary judgment, pursuant to Fed. R. Civ. P. 56(a), against all Plaintiffs and against Defendant Continental Terminals, Inc. ("Continental") (ECF No. 85); second, Continental moves for summary judgment against all Plaintiffs (ECF No. 86); and third, all Plaintiffs cross-move for partial summary judgment against RTC. (ECF No. 91). After

reviewing the submissions made in support of and opposition to the instant motions, as well as the arguments made on the record during oral argument on June 14, 2017 (ECF No. 128, "Tr."), and for the reasons set forth below,[1] RTC's motion is DENIED as to Plaintiffs and GRANTED in part and DENIED in part as to Continental; Continental's motion is DENIED; and Plaintiffs' cross-motion is GRANTED.

The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## II.   **BACKGROUND**

This case arises from the destruction of large quantities of coffee and cocoa by flooding from Hurricane Sandy on October 29, 2012. RTC owns the two warehouses, named Warehouse 54 and Warehouse 149 (collectively, the "Warehouses"), in Kearny, New Jersey, where the coffee and cocoa were stored before and during the storm. Continental leased the Warehouses from RTC and agreed to store the coffee and cocoa. Plaintiffs HDI Gerling Industrie Versicherung AG ("HDI"), XL Specialty Insurance Co. ("XL"), Axis Insurance Company ("Axis"), B.D.M. NV ("BDM"), Ace European Group, Ltd. ("Ace"), and Royal & Sun Alliance Insurance, PLC ("Royal," collectively, "Plaintiffs") are the insurers and subrogees of distributors whose coffee and cocoa were destroyed (the "Insureds").

HDI and XL filed suit on April 22, 2014; Axis and BDM filed on July 23, 2014; Ace on June 29, 2015; and Royal on January 19, 2016. Each Plaintiff brings claims against Continental for breach of contract, breach of bailment, negligence, and breach of warranty. (ECF No. 42[2]).

---

[1] The Court considers any new arguments not presented by the parties to be waived. See Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1298 (3d Cir. 1991).

[2] Citations to the docket are to Civil Action No. 14-cv-2571. Royal filed suit separately, Civil Action No. 16-cv-625, but the actions have been consolidated under the first docket. Royal's allegations and causes of action are the same as those of the other Plaintiffs.

Plaintiffs claim Continental should not have stored the coffee and cocoa in badly maintained warehouses located in low-elevation areas that were near water and prone to flooding. Plaintiffs also claim Continental improperly stored the coffee and cocoa, failed to take pre-storm precautions, and failed to salvage the coffee and cocoa promptly.

Each Plaintiff also brings a claim against RTC for "premises liability/negligence." Plaintiffs claim RTC should not have leased the Warehouses to Continental because their location was susceptible to flooding, and that RTC should have warned Plaintiffs about the flood risk. Plaintiffs also claim RTC failed to maintain and repair the Warehouses properly.

Continental and RTC have cross-claimed against each other, but only RTC has moved for summary judgment on its cross claims. RTC cross-claimed for indemnification, contribution, and breach of contract. (ECF No. 44). RTC's indemnification cross-claim is based in contract; the contribution cross-claim is based on New Jersey statutory law; and the contract claim is based on Continental's alleged failure to procure insurance to cover RTC. (Id.).

The Court treats more fully the background relevant to each motion in the "Discussion" section below. See infra Part IV.

## III.   LEGAL STANDARD

Summary judgment is appropriate if the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" demonstrate that there is no genuine issue as to any material fact, and, construing all facts and inferences in a light most favorable to the non-moving party, "the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).

The moving party has the initial burden of proving the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. Once the moving party meets this burden, the non-moving party has the burden of identifying specific facts to show that, to the contrary, a genuine issue of material fact exists for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In order to meet its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324; see also Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact," the opponent must "exceed the 'mere scintilla' threshold . . . ."). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

## IV.   DISCUSSION

### A.   RTC's Motion against Plaintiffs and Plaintiffs' Cross-Motion

RTC moves for summary judgment against all Plaintiffs, arguing it did not owe a duty of care to the Insureds because it had no direct relationship with the Insureds and no responsibility for maintaining the Warehouses. Plaintiffs cross-move for partial summary judgment on the same issue, asking the Court to find RTC owed the Insureds a duty as a matter of law.

4

1.    Background

Plaintiffs and RTC do not dispute the following factual background.

RTC owns and rents out warehouses in Kearney, New Jersey, including the Warehouses where the Insureds' coffee and cocoa were stored when Hurricane Sandy made landfall there. RTC leased the two Warehouses to Continental pursuant to two separate lease agreements. The lease agreements each provided that Continental had the right to "use the Premises for warehousing and distribution of goods, primarily coffee, cocoa, tea and other commodities of a similar nature, office use incidental thereto, and for no other purpose." (RTC's 56.1 ¶¶ 14, 25).

The lease agreements also set forth the division of repair and maintenance responsibilities between RTC and Continental. Under the lease agreements, RTC remains responsible for repairing the foundation, roof, exterior walls, and structural steel, so long as Continental gives prompt notice and the condition requiring repair does not "arise, directly or indirectly, out of the manner of use of the Premises by, or any act or omission of" Continental, its employees, contractors, and invitees. (RTC's 56.1 ¶¶ 17, 28). Continental, on the other hand, "assumes the sole responsibility for the condition, operation, maintenance, repair (structural and otherwise) and management of the Premises and the parking lot[,]" in particular, "the Building Equipment, roof, foundations, walls, fences, lawns, shrubbery, roads, parking lots, and appurtenances thereto," and must make prompt repairs and replacements as needed. (Id.). RTC also has the right to notify Continental of repairs not performed and perform them itself. (Pls.' 56.1 ¶ 94(h)).

Warehouses 54 and 149 are located about 500 and 300 feet from the Hackensack River, respectively. (Pls.' 56.1 ¶¶ 74-75). Both were built on "wet, permeable ground" and continued to settle. (Id. ¶ 77). Both are located in what the Federal Emergency Management Agency ("FEMA") deems a high risk flood zone, in that there is at least a one percent annual chance of the

area being inundated with water, which RTC knew before Hurricane Sandy hit. (Id. ¶¶ 78-79, 81).

FEMA determined there was a better-than-26% chance during a 30-year period that water in this

area would reach an elevation of 9 feet above sea level. (Id. ¶ 82). Warehouse 54's mean floor

elevation in the product storage area is only 8.2 feet, and Warehouse 149's mean floor elevation

is 7 feet, with its lowest point in the product storage area at 6.2 feet. (Id. ¶ 83).

      RTC had previously experienced flooding in the parking lot in front of the Warehouses,

including during Hurricane Irene in 2011. (Pls.' 56.1 ¶¶ 86-87). In 2005, RTC wrote a plan to

raise and stabilize the floors in Warehouse 54, but never implemented it. (Id. ¶ 89). RTC personnel

had also discussed demolishing both Warehouses and explored ways to prevent flooding in the

future, but never acted on any of these discussions. (Id. ¶¶ 90, 92). RTC also did not prepare a

Flood Emergency Response Plan for the Warehouses in 2005 despite FEMA's public

recommendation to do so in the wake of Hurricane Katrina. (Id. ¶¶ 92-93).

      On and before October 29, 2012, Continental had allowed the Insureds' coffee and cocoa

to be stacked four tiers high and too close together, in violation of the Certificate of Occupancy's

weight limits. (Pls.' 56.1 ¶¶ 95-98). Moreover, the floors and walls of the Warehouses were in

disrepair. In particular, the floors were "wavy and uneven, with unrepaired craters, which created

a 'bathtub effect' in which water could pool[,]" a significant portion of the floors were cracked

and sloped up to 12 inches, and some of the Warehouses' doors were broken. (Id. ¶ 98).

      Regarding Hurricane Sandy, on October 23, 2012, the New York City Forecast Office

predicted "low potential for a major coastal storm with heavy rainfall . . . high winds . . . coastal

flooding and beach erosion early next week." (Pls.' 56.1 ¶ 99(a)). On October 25, the National

Hurricane Center accurately forecasted Hurricane Sandy's track, including its landfall in New

Jersey, and the New York City Forecast Office, the New York Times, and Fox News all predicted

coastal flooding and storm surges. (Id. ¶ 99(b)-(e)). On October 26, the Port Authority of New York and New Jersey issued a press release indicating they were preparing for a "significant coastal storm early next week, which forecasters say will bring hurricane force winds, heavy rain, record high tides, and coastal flooding to the region," and advising its maritime terminal tenants to place sandbags at the base of cargo doors to minimize water intrusion. (Id. ¶ 99(f)). The same day, ABC described Sandy as a "once-in-a-lifetime storm" with "possible record surging tides" and a storm surge of up to 10 feet. (Id. ¶ 99(g)).

RTC took no action to prepare for Sandy or prevent damage from it. (Pls.' 56.1 ¶ 101).

Flooding in Warehouses 54 and 149 destroyed or damaged a significant portion of the Insureds' goods. By contrast, in Warehouse 100, which was at a higher elevation, very little coffee or cocoa that was stored there was damaged. (Pls.' 56.1 ¶ 104).

        2.    Analysis

"The question of whether a duty to exercise reasonable care to avoid the risk of harm to another exists is one of fairness and policy that implicates many factors." Carvalho v. Toll Bros. and Developers, 143 N.J. 565, 572 (1996). "The determination of such a duty is generally considered a matter of law properly decided by the court." Id. (internal quotation omitted). This inquiry "involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993). Moreover, "[t]he foreseeability of harm is a significant consideration in the determination of a duty to exercise reasonable care." Carvalho, 143 N.J. at 572.

Weighing these factors, the Court finds RTC owed the Insureds a duty of care.

The first factor, the relationship between the Insureds and RTC, is neutral. RTC and the Insureds did not have a direct business relationship, because the Insureds dealt with Continental. On the other hand, RTC knew from the terms of the lease agreements with Continental that coffee, cocoa, and similar goods would be stored there (RTC's 56.1 ¶¶ 14, 25), and the Insureds' business helped Continental to pay close to a million dollars in rent per warehouse per year to RTC. (Pls.' 56.1 ¶ 94(b)-(c)). Moreover, under the terms of the lease agreements, RTC retained a certain amount of responsibility for maintaining the warehouses. (Id. ¶¶ 17, 28).

The second factor, the nature of the attendant risk, and the fourth factor, public interest, weigh in favor of finding a duty. As the Insureds experienced in this case, flooding and the pooling of water in a warehouse can be catastrophic to the kinds of food products RTC knew would be stored in the Warehouses. RTC is in the business of leasing warehouses and it is not unfair to impose on it the obligation to be mindful of a risk so detrimental to the goods stored there. Moreover, as the owner of the property, RTC was in some respects in the best position to protect its tenants and their customers from risks inherent in the property.

The third factor, the opportunity and ability to exercise care, weighs heavily in favor of finding a duty. RTC retained the obligation and ability to make repairs to the Warehouses, even if Continental declined to do so, specifically with respect to the floors. Plaintiffs claim the failure to maintain the floors caused floodwaters to pool and exacerbated the damage to the Insureds' products. RTC made a plan to raise the floor in Warehouse 54 years before Hurricane Sandy hit, and discussed demolishing the Warehouses in light of the flood risks, yet never implemented either plan. Both plans demonstrate RTC's opportunity and ability to exercise care.

Finally, the fifth factor, foreseeability, weighs heavily in favor of finding a duty. The undisputed evidence shows RTC was or should have been aware that the Warehouses were at risk

for flooding. As explained above, FEMA had indicated there was a 26% chance that water levels would reach 9 feet during a 30-year period, which is well above the floor level of both Warehouses. RTC experienced flooding in the parking lot of the Warehouses just a year earlier during a less serious storm. RTC employees discussed how to prevent flooding, but ultimately did nothing. Moreover, RTC's unexecuted plans to raise the floors or demolish the Warehouses tend to show RTC's awareness that the floors in the Warehouses were too low.

RTC argues it did not have a duty toward the Insureds because its lease agreements delegated to Continental the responsibility to maintain the premises. The Court disagrees. As discussed above, under the lease agreements, RTC retained the obligation to maintain the foundation, roof, walls, and structural steel of the Warehouses. (RTC's 56.1 ¶¶ 17, 28). A significant part of Plaintiffs' claim is that problems with the walls and particularly the floors of the Warehouses caused or exacerbated the damage to the Insureds' products. Therefore, RTC retained some responsibility to maintain the parts of the Warehouses whose alleged negligent maintenance may have caused significant damages.

Accordingly, summary judgment is not warranted in RTC's favor. Partial summary judgment is warranted in favor of Plaintiffs, that RTC owed a duty to the Insureds in this case.

### B.    RTC's Motion against Continental

RTC also moves affirmatively for summary judgment on its cross-claims against Continental for contractual indemnification and breach of contract. First, RTC contends that, under the terms of the lease agreements for the Warehouses, Continental must indemnify RTC against Plaintiffs, even if RTC's negligence caused the Insureds' losses. (RTC's Br. at 11-15). Continental counters that the indemnification clause is unenforceable because RTC knew one of the Warehouses had flooded in 1992, yet failed to disclose this to Continental before they entered

into a lease in 1998. (Continental's Opp. Br. at 2-10, 13-16). Second, RTC contends Continental

breached its obligation under the lease agreements to provide RTC with general liability insurance.

(RTC's Br. at 15-16). Continental responds that RTC lacks standing to bring this claim because

RTC's insurer is the real party in interest. (Continental's Opp. Br. at 10-13).

       1.    <u>Background</u>

     The lease agreements between RTC and Continental provide the following with respect to

Continental's indemnification obligations (the "Indemnification Clause"), in relevant part:

> Notwithstanding that joint or concurrent liability may be imposed
> upon [RTC] by statute, ordinance, rule, regulation, order or court
> decision, and notwithstanding any insurance furnished by
> [Continental] to [RTC] pursuant hereto or otherwise, [Continental]
> shall and does hereby indemnify and hold harmless [RTC] . . . from
> and against any and all loss, liability, fines, suits, claims,
> obligations, damages, penalties, demands and actions, and costs and
> reasonable expenses of any kind or nature (including architects' and
> attorneys' fees) due to or arising out of any of the following: . . . (c)
> any . . . damage to property (including loss of property) occurring
> in, on or about the Premises or the Facility or any part thereof . . .
> even if due to the negligence of [RTC] . . . .

(RTC's 56.1 ¶¶ 18, 29).

     Continental has submitted evidence regarding RTC's knowlege about some degree of

flooding in Warehouse 149 that occurred before Continental entered into the lease agreements in

1998. Alan Lambiase, the Director of Sales and Marketing for RTC, testified at his deposition that

in 1992, an unnamed employee from one of Warehouse 149's tenants told him "they had some

water inside the building." (Continental's 56.1 ¶ 6). RTC's general manager Robert Neu testified

at his deposition that he learned from his predecessor that flooding had occurred in 1992 on the

property where the Warehouses are located, although Neu's predecessor said nothing specifically

about either of the Warehouses at issue in this case. (<u>Id.</u> ¶ 8). Continental's senior vice president,

Doug Martocci, claims Continental would not have agreed to the Indemnification Clauses had they known there was flooding in 1992. (Id. ¶ 10).

The lease agreement for Warehouse 54 provides the following with respect to Continental's obligation to provide insurance for RTC, in relevant part:

> [Continental] shall obtain and keep in full force and effect during the Term, at its own cost and expense: (a) comprehensive general liability insurance . . . having a combined single limit of not less than $3,000,000, protecting [RTC] . . . against any and all claims for personal injury, death or property damage occurring in, upon, adjacent to or connected with the Premises . . . and (b) insurance . . . . against loss or damage by any and all risks and hazards to [Continental's property] . . . for the full insurable value thereof . . . . All such insurance to be obtained by [Continental] . . . shall be written as primary insurance not contributing with any coverage that [RTC] may carry.

(RTC's 56.1 ¶ 19). The lease agreement for Warehouse 149 is substantially similar except clause (a) requires Continental to provide "public liability insurance" instead of "comprehensive general liability insurance" (together, the "Insurance Clauses"). (Id. ¶ 30).

Continental obtained insurance policies for RTC through two, different insurance companies, Pacific Indemnity Company ("Pacific") and Chubb Insurance Company of New Jersey ("Chubb"). (Continental's 56.1 ¶ 12). Continental tendered Plaintiffs' claims to these companies for defense and indemnification, but the insurance companies refused to cover the claims. (Id. ¶ 13). RTC thus obtained defense and indemnification from its own insurer, Zurich American Insurance Company ("Zurich"). (Id. ¶ 14). Zurich, acting both in its own capacity and as RTC's subrogee, has since sued Pacific and Chubb in a separate action,[3] seeking declaratory judgment that Pacific and Chubb must defend and indemnify RTC in this action, as well as reimbursement for Zurich's expenses defending RTC. (Id. ¶¶ 15-16). At oral argument, RTC's counsel indicated

---

[3] Zurich Am. Ins. Co. v. P. Indemn. Co., 16-cv-830 (D.N.J.).

that this matter has settled, but that RTC might not ultimately be fully covered in this action. (Tr. 146:3-147:3).

      2.    Indemnification Claim

Continental does not dispute that the lease agreements contain indemnification obligations. Continental's sole argument is that the Indemnification Clauses are unenforceable because RTC did not tell Continental in 1998, when they entered into leasing agreements, that Warehouse 149 and the premises generally had flooded after a storm in December 1992. (See, e.g., Continental's Opp. Br. at 9). On this basis, Continental argues RTC fraudulently induced it to agree to the Indemnification Clauses, and/or that RTC should be equitably estopped from enforcing them. The Court disagrees.

Both fraudulent inducement and equitable estoppel require the misrepresentation or omission at issue to be material. Allstate New Jersey Ins. Co. v. Lajara, 222 N.J. 129, 147 (2015) (fraud); Rodichok v. Limitorque Corp., No. 95–3528, 1997 WL 392535, at *13 (D.N.J. July 8, 1997) (citing Carlsen v. Masters, Mates & Pilots Pension Plan Tr., 80 N.J. 334, 339 (1979)) (equitable estoppel). Here, Continental has only submitted evidence showing RTC's general manager knew generally about flooding in 1992, and that its sales and marketing director heard there was "some water inside [Warehouse 149]." (Continental's 56.1 ¶ 6). Continental provides no evidence RTC knew more than this very vague information about one flooding incident in 1992, or that RTC knew anything at all about the risk of flooding in Warehouse 54. Thus, Continental has failed to present more than a "mere scintilla" of evidence, see Big Apple BMW. Inc., 974 F.2d at 1363, that the information RTC may have withheld was material.

Accordingly, summary judgment is warranted as to the enforceability of Continental's indemnification obligations under the lease agreements.

### 3. Failure to Insure Claim

Continental argues RTC lacks Article III standing to bring its claim against Continental for failure to provide insurance as required by the Insurance Clauses in the lease agreements, because Zurich, RTC's insurer and subrogee, is the real party in interest. In support of this contention, Continental points to Zurich's separate lawsuit against Pacific and Chubb as Continental's subrogee. But that lawsuit concerns whether Pacific and Chubb were obligated to indemnify RTC under the policies Continental obtained on RTC's behalf. The claim at issue here, by contrast, concerns whether Continental obtained insurance for RTC that met the requirements set forth in the Insurance Clauses. Thus, it is not apparent to the Court why RTC would not be the party in interest in a different case in which Zurich is not acting as subrogee.

However, the Court will deny RTC's motion for summary judgment on this claim for a different reason. RTC's claim is that Continental failed to provide insurance for RTC as required under the Insurance Clauses. But Continental submitted evidence (see Continental's 56.1 ¶ 12; McCourt Aff. Exs. F-H) that it did provide this insurance. In its papers and at oral argument, RTC has failed to explain why this insurance does not meet the Insurance Clauses' requirements. Therefore, the Court cannot find at this stage that there is no question of fact as to whether Continental breached the Insurance Clauses in the lease agreements.

Accordingly, summary judgment is not warranted on this claim.

### C. Continental's Motion

Continental moves for summary judgment against Plaintiffs as to all claims, on two grounds that concern the "Stripping Reports," that is, the warehouse receipts Continental issued upon receipt of the Insureds' goods. First, Continental contends Plaintiff's claims are untimely because Plaintiffs did not comply with the timeliness requirements in the Stripping Reports.

(Continental's Br. at 4-9). Second, Continental argues the Stripping Reports fully disclaim its liability for the Insureds' losses. (Id. at 9-18). Finally, Continental also moves for summary judgment on the ground that it had no duty to attempt to avoid injury from a storm whose magnitude was as unforeseeable as that of Hurricane Sandy. (Id. at 18-24).[4]

      1.    Background

As a routine practice, Continental issues Stripping Reports to customers upon receipt of the goods to be stored in its warehouses. (Continental's 56.1 ¶ 38). In support of this motion, Continental has submitted two sample Stripping Reports of the types that it claims it would have issued to the Insureds. (Martocci Aff. ¶¶ 12-13, Exs. A & B). Each sample is one page long and contains the following provision regarding claims and suits (the "Timeliness Provision"):

> (a) The warehouseman shall not be liable for any loss, delay, demurrage, or damage unless the claim therefore has been presented in writing within a reasonable time, and, in any event, not later than sixty (60) days from the date of shipment from the warehouse, or within sixty (60) days from the date the storer requested delivery in the event that shipment is not made. Such notice of claim shall be presented to the warehouseman in person, or by certified mail.
>
> (b) No action at law or in equity shall be brought in connection with any loss or damage prior to the expiration of sixty (60) days after presentation of claims therefore, nor shall such action be brought at all unless brought within one year from the expiration of the sixty (60) day period last mentioned.

(Id. ¶ 16, Exs. A & B). The sample Stripping Reports also contain the following provision regarding liability (the "Liability Provision"):

> (a) The warehouseman is liable for damage for loss of or injury to the goods caused by its failure to exercise such care in regard to

---

[4] Continental, in its moving brief, appeared to move for summary judgment on an additional ground, an "Act of God" defense. (Continental's Br. at 1). On reply, however, and at oral argument, Continental clarified that it is not moving for summary judgment based on this defense. (Continental's Reply Br. at 26 ("Continental did not seek summary judgment on its Act of God defense[.]"); Tr. at 60:10-11 ("There is no affirmative motion on the Act of God defense[.]"))

them as a reasonable careful man would exercise under like
circumstances, but unless otherwise agreed in writing, it is not liable
for damages which could not have been avoided by the exercise of
such care. The warehouseman shall not be liable for loss, damage,
delay or demurrage caused by acts of God, . . . or by . . . flood, wind,
storm, . . . or by any other cause beyond the control [of] the
warehouseman, or by any cause not originating in the warehouse.

(Id. ¶ 15, Exs. A & B). Besides the Timeliness and Liability Provisions, there is also a provision

limiting monetary damages not at issue here. (Id.).

However, Plaintiffs dispute that the Insureds received Stripping Reports from Continental

that are, in fact, the same as the sample Stripping Reports. Specifically, at a deposition, one

employee of HDI's Insured identified a series of Continental's Stripping Reports that the Insured

received upon storing its coffee in the Warehouses. (ECF No. 107-1 at 50:21-51:13). Plaintiffs

have submitted fifty-six of the Stripping Reports the employee identified. (Eagan Decl. ¶ 51 &

Ex. 51).[5] All fifty-six of these Stripping Reports appear similar in form to the samples, except that

the Timeliness and Liability Provisions, as well as the provision limiting monetary damages, are

truncated in exactly the same way. (Id. Ex. 51). Specifically, each provision on each Stripping

Report begins with the same words as the provisions in the samples, but is missing multiple lines

of text and is cut off on the right margin. (Compare id. with Martocci Aff. Exs. A & B). As a

result, the Timeliness and Liability Provisions are unintelligible in each of the fifty-six Stripping

Reports Plaintiffs have submitted.

---

[5] Continental objects to these documents on authenticity grounds because the witness did not
authenticate each document individually at her deposition. (ECF No. 111). The Court is satisfied
based on the deposition transcript that this witness could properly authenticate these documents at
trial, and thus, the Court will consider them for the present motion.

In November 2012, the Insureds of HDI, Ace, and BDM each sent a correspondence to Continental indicating they intended to hold Continental responsible for their lost coffee and/or cocoa. (Klein Aff. ¶¶ 4, 6, 8 & Exs. A, C, E).[6] On November 7, 2012, HDI's Insured wrote:

> On November 1st, 2012 you advised that coffee stored at your facility . . . sustained hurricane "Sandy" wind; rain and flood waters damaged.
>
> On November 6th, 2012 we inspected your facility and were able to confirm your advise [sic]. We therefore are holding Continental Terminals Inc. owners, agents responsible for the loss/damage to our cargo and as soon as the full extent of the short/damage can be determined, a formal claim will be filed against your company.

(Id. Ex. E). On November 14, 2012, Ace's Insured wrote:

> This is to notify you that the above consignment, origin cocoa beans, may have been damaged and possibly determined to be in an unusable condition as a result of post-tropical cyclone Sandy.
>
> Although the full extent of the loss has not been determined, we are holding Continental responsible for the loss sustained whilst in your care, custody and control and will be seeking recovery/recompense accordingly.

(Id. Ex. A). On November 22, 2012, BDM's insured wrote:

> At the date of 29th October 2012, we have a quantity of 408,987 Mt of Nigerian cocoa beans (6,474 bags) stored in the warehouse [of] Continental Terminals . . . .
>
> Following the Hurricane Sandy, we have contacted our cargo insurers and a survey is now arranged by EIMC.
>
> After two inspections of the surveyor in the warehouse, it is not yet possible to determine the extent of the loss to our goods.
>
> Considering the situation, we hold you fully responsible for all the material and financial consequences of the losses.

---

[6] Continental submits other correspondence that relates to the Insureds' products, such as surveys of damage and salvage sales, but it is not apparent to the Court that any of these even arguably constitute the type of written claims contemplated in subsection (a) of the Timeliness Provision. (See Klein Aff. ¶¶ 5, 7, 9-14 & Exs. B, D, F-K).

> We will revert to you as soon as quantity of damaged bags could be
> ascertained. In the meantime, could you please provide us with the
> contact details of your liability insurers.

(Id. Ex. C).

### 2.  Timeliness of Claims

First, Continental argues Plaintiffs' claims are barred under the Timeliness Provision

because no claims were filed in court within one year and sixty days of either: (1) the Insureds

presenting a claim to Continental; or (2) the Insureds becoming aware of the damage to their

product. (Continental's Br. at 8, 26). Plaintiffs counter that Continental has waived this defense

(Pls.' Br. at 13), and that the Timeliness Provision does not bar their claims. (Id. at 17).

Because the Court finds summary judgment is not warranted on the merits of this defense,

the Court does not reach the question of waiver.[7]

Plaintiffs argue that the limitations period set forth in the Timeliness Provision never began

to run because the initial sixty-day period in subsection (a) was never triggered, either by the

Insureds "request[ing] delivery" or by "shipment from the warehouse[,]" and thus the one-year-

and-sixty-day period in subsection (b) was never triggered either. (Pls.' Br. at 17).

The Court begins its analysis by examining subsection (a). It is undisputed that neither

Plaintiffs nor their Insureds ever requested delivery of the coffee and cocoa, and delivery never

occurred. Moreover, Continental has put forth no evidence showing the absence of a genuine

---

[7] This is appropriate because waiver turns in part on whether a plaintiff is prejudiced by a
defendant's delay in raising an affirmative defense. See Cetel v. Kirwan Fin. Grp., Inc., 460 F.3d
494, 506 (3d Cir. 2006). Plaintiffs contend they were prejudiced by their inability to take discovery
to contest this defense. As set forth below, there remain several questions of fact as to whether
Plaintiffs' claims are time-barred, i.e., whether all Plaintiffs' Insureds received Stripping Reports,
or whether they presented claims to Continental within a reasonable time. If Plaintiffs can
demonstrate that Continental's delay in asserting this defense has made it more difficult for them
to take the discovery they would need to prevail on these issues, it would likely help the Court
determine whether Plaintiffs were prejudiced, and thus whether waiver occurred.

factual dispute as to whether Plaintiffs or their Insureds presented a written claim within a "reasonable time," the other potential trigger in subsection (a). Thus, there is at least a question of fact as to whether Plaintiffs or their Insureds were ever obligated under subsection (a) to present a claim to Continental. Continental appears to agree. (See Tr. at 48:16-17 ("[W]e're not suggesting, Judge, that anybody blew the 60-day time period.")).

The parties disagree, however, about the operation of subsection (b). The one-year-and-sixty-days limitations period for filing suit set forth in subsection (b) runs from "presentation of claims" for "loss or damage[.]" (Martocci Aff. ¶ 16, Exs. A & B). Read in context with subsection (a), "presentation of claims" appears to refer back to the subsection (a) requirement that "the claim [for loss, delay, demurrage, or damage] has been presented in writing[.]" (Id.). The Court interprets this to mean the one-year-and-sixty-days period in subsection (b) is not triggered until the storer presents a claim to Continental under subsection (a).[8]

Continental argues that the one-year-and-sixty-days limitations period is also triggered when Plaintiffs learn of the damage to their goods, which Continental contends would render all Plaintiffs' claims untimely. (See Continental's Br. at 8). The Court disagrees. The Stripping Report does not refer to the point in time at which the storer learns of the damage. Nor is the Court persuaded by Continental's citation of the factually distinguishable Phillips Bros., Div. of Engelhard Mineral & Chem. Co., 760 F.2d 523 (4th Cir. 1985). In Phillips, the Fourth Circuit considered the following contractual limitations period:

> Claims by the depositor must be presented in writing within a reasonable time, and in no event longer than 60 days after delivery of the goods. No action may be maintained by the depositor against

_____

[8] To the extent subsection (b) is capable of a different interpretation, the Court adopts this interpretation for the purposes of this motion because New Jersey law generally favors construing ambiguity against the drafter. Kotkin v. Aronson, 175 N.J. 453, 455 (2003). Continental has not presented parol evidence to clarify any ambiguity in the Stripping Reports.

> the warehouseman for loss or damage to goods covered hereunder
> unless commenced within nine months next after date of delivery by
> the warehouseman.

Id. at 524. The Fourth Circuit rejected plaintiff's argument that, because no delivery occurred, the 60-day and nine-month limitations periods were never triggered. Id. at 526. In so doing, the court noted that the contract explicitly contemplated claims for lost goods. Id. The court found it would be "unreasonable" to interpret the contract's limitations periods as running only from the date of delivery because lost goods necessarily cannot be delivered. Id. Thus, such an interpretation would render the limitations periods meaningless for lost goods. Id. The court therefore held that the limitations periods also ran from the date defendant informed plaintiff its goods had been lost. Id. In the present case, by contrast, the Timeliness Provision causes the limitations period to run either from the delivery date or "from the date the storer requested delivery in the event that shipment is not made." (See Martocci Aff. ¶ 16, Exs. A & B). Moreover, claims must be made within a reasonable time. (Id.). Because of these additional parameters, the Timeliness Provision operates in cases of "loss, delay, demurrage, or damage," the four types of claims it covers explicitly. For this reason, unlike the court in Phillips, the Court need not invent an additional trigger.

As discussed above, see supra Part IV.C.1, Continental has not shown that XL, Axis, and Royal & Sun or their Insureds presented claims to Continental pursuant to subsection (a) of the Timeliness Provision, or that any such written claim was ever required under the terms of subsection (a). Therefore, there is at least a question of fact as to whether the one-year-and-sixty-days period in subsection (b) was ever triggered for these Plaintiffs or their insureds. As such, the Court cannot grant summary judgment against these Plaintiffs on timeliness grounds.

As for HDI, BDM, and Ace, Plaintiffs' Insureds arguably presented claims under subsection (b) in November 2012, yet failed to file suit within a year and sixty days thereafter. Subsection (b) states that "[n]o action at law or in equity shall be brought in connection with any loss or damage . . . unless brought within one year from the expiration of [sixty (60) days after presentation of claims therefore]." (Martocci Aff. ¶ 16, Exs. A & B). Thus, the argument goes, regardless of when or whether HDI, BDM, or Ace were required to present a claim to Continental under subsection (a), once they <u>did</u> present claims, it triggered the one-year-and-sixty-day period in subsection (b). Plaintiffs respond that the November 2012 communications were not "presentation[s] of claims" because they were not "final" and were made before the full extent of the Insureds' losses were known. (Pls.' 56.1 ¶¶ 50, 65, 69). Moreover, Plaintiffs argue the November 2012 communications did not trigger the one-year-and-sixty-day period because they were not required to present claims under subsection (a). (Tr. at 68:17-25).

Ultimately, though, the Court need not decide yet whether the November 2012 communications triggered the one-year-and-sixty-days limitations period because Continental has not sufficiently demonstrated that these Insureds ever received Stripping Reports containing the Timeliness Provision for any or all of their coffee or cocoa. The sample Stripping Reports are competent evidence to demonstrate Continental's routine practice of issuing identical Stripping Reports. <u>See</u> Fed. R. Evid. 406. However, by submitting the fifty-six Stripping Reports HDI's Insured received that did not contain the Timeliness Provision in an intelligible form, Plaintiffs have cast genuine doubt not only on whether HDI's Insured became bound by the Timeliness Provision, but on whether Continental is correct that <u>all</u> of its Stripping Reports contain the Timeliness Provision. Indeed, viewing the evidence in the light most favorable to Plaintiffs, there

is a question of fact as to whether all of the coffee and cocoa at issue in this case was subject to a Stripping Report containing the Timeliness Provision.

Accordingly, summary judgment on the timeliness defense is not warranted.

### 3. Disclaimer of Liability

Next, Continental argues that the Liability Provision completely exempts it from liability, even for its own negligence, because the coffee and cocoa were destroyed by "flood," "storm," and causes "not originating in the warehouse." (Continental's Br. at 12). The Court is not persuaded that the Liability Provision bars this suit.

A warehouse "may insert in its receipt any terms that are not contrary to the Uniform Commercial Code and do not impair its obligation of delivery under 12A:7-203 or its duty of care under 12A:7-204. Any contrary provision is ineffective." N.J.S.A 12A:7-202(c); accord Jasphy v. Osinsky, 364 N.J. Super. 13, 22-23 (App. Div. 2003). "A warehouse is liable for damages for loss of or injury to the goods caused by its failure to exercise care with regard to the goods that a reasonably careful person would exercise under similar circumstances." N.J.S.A. 12A:7-204(a). A warehouse may limit damages "by a term in the warehouse receipt or storage agreement limiting the amount of liability in case of loss or damage beyond which the warehouse is not liable." Id. 12A:7-204(b) (emphasis added). The commentary to 12A:7-204 reiterates that, although 12A:7-204(b) allows a warehouse to limit liability for damages, a warehouse may not "disclaim by contract [its] obligation of care." Id. cmt. 2.

To the extent the Liability Provision purports to disclaim liability for Continental's negligence with respect to the Insureds' "loss, damage, delay or demurrage caused by acts of God, . . . or by . . . flood, wind, storm, . . . or by any other cause beyond the control [of] the warehouseman, or by any cause not originating in the warehouse" (Id. ¶ 15, Exs. A & B), it is

unenforceable under N.J.S.A. 12A:7-202(c) and 12A:7-204(a). Enforcing the Liability Provision in this manner would impair Continental's duty to "exercise care with regard to the goods that a reasonably careful person would exercise under similar circumstances." N.J.S.A. 12A:7-204(a); accord Jasphy, 364 N.J. Super. at 23 ("[W]e note that the contract here attempts to limit defendant's liability even for their own negligence. Such a limitation in storage agreements is impermissible . . . since it conflicts with a warehouseman's duty of care under [12A:7-204(a).]").

Continental responds by arguing that 12A:7-202(c) and 12A:7-204 only prohibit a warehouse from effecting a "<u>complete</u> exemption from liability for losses proximately resulting from the negligence" of the warehouse, as opposed to a partial exemption. (Continental's Br. at 11 (quoting <u>Silvestri v. S. Orange Storage Corp.</u>, 14 N.J. Super. 205, 209-10 (App. Div. 195) (emphasis added)). Continental thus contends that the Liability Provision is enforceable because it only <u>partially</u> disclaims losses caused by Continental's negligence, that is, only if the damage results from "flood, storm, causes originating outside of the warehouse, [or] causes outside the control of Continental. In all other instances, Continental would be liable for any and all negligence on its part." (<u>Id.</u> at 16). The Court disagrees.

The case law on total versus partial disclaimers of liability does not support Continental's argument that a disclaimer is enforceable so long as it only applies to some factual causes of loss rather than all causes. Moreover, this distinction is not consistent with the text of the statutes. N.J.S.A. 12A:7-202(c) voids "[a]ny" contract provisions that "impair [a warehouse's] . . . duty of care under 12A:7-204," not just contract provisions that, say, "completely eliminate" a warehouse's duty of care, or that "impair" the warehouse's duty of care "in all factual situations." See N.J.S.A. 12A:7-202(c). Even a disclaimer of liability for negligence in <u>some</u> factual scenarios would seem to "impair" a warehouse's duty to exercise reasonable care. <u>Cf.</u> <u>Allstate Ins. Co. v.</u>

22

Winnebago Cty. Fair Ass'n, Inc., 131 Ill.App.3d 225, 231 (Ill. App. Ct. 1985) (disclaimer of all liability for fire damage regardless of negligence is unenforceable under Illinois' equivalent statutes).

Instead, the relevant case law distinguishes between a warehouse contractually limiting damages, which is permissible, and totally disclaiming liability, which is not. See OFI Int'l, Inc. v. Port Newark Refrigerated Warehouse, No. 11-cv-6376, 2015 WL 140134, at *5, *9 (D.N.J. Jan. 12, 2015) (noting in a case where the contract capped monetary recovery for items stored in a warehouse that, "[w]hile a common carrier and a bailee cannot effectuate a complete exemption from liability for losses proximately resulting from the negligence of the carrier or bailee, nothing prevents them from placing limitations on that liability"); Choice Canning Co. v. MCST Preferred Transp., Inc., 2006 WL 3511467, at *3 (N.J. Super. App. Div. Dec. 7, 2006) (enforcing a contract that "did not disclaim all liability, including any loss created by [the warehouse's] own negligence" but rather "only limited [the warehouse's] liability to the value of the goods stored in its facility"); Silvestri, 14 N.J. Super. 210 (contrasting an unenforceable "complete exemption from liability for losses proximately resulting from the negligence of the carrier or bailee" with an enforceable "special agreement [to d]iminish the pecuniary liability of the bailee"); see also Allstate Ins. Co., 131 Ill.App.3d at 231 (refusing to enforce a disclaimer of liability for all fire damage because Illinois' equivalent to 12A:7-204 "allow[s] only an agreed monetary limit of liability as opposed to total exemption from all liability for damages"). This distinction is consistent with the text of N.J.S.A. 12A:7-204, which allows "a term in the warehouse receipt or storage agreement limiting the amount of liability" but prohibits a warehouse from "disclaim[ing] by contract [its] obligation of care." N.J.S.A. 12A:7-204(b) & cmt. 2 (emphasis added).

23

Thus, the Liability Provision is unenforceable to the extent it would disclaim liability for Continental's negligence. Accordingly, summary judgment is not warranted on this ground.[9]

### 4. Foreseeability of Hurricane Sandy

Finally, Continental argues summary judgment is warranted because Hurricane Sandy itself was unforeseeable until the last minute. However, as set forth supra Part IV.A.1 and in Plaintiffs' 56.1 counter-statement in opposition to this motion (Pls.' 56.1 ¶ 87), several forecasts from October 23, 2012 onward stressed the increasing possibility of storm surge and coastal flooding from Sandy. This creates a question of fact as to whether the storm was foreseeable.

Accordingly, summary judgment is not warranted on this ground.

## V. **CONCLUSION**

For the reasons above, the Court decides the present motions as follows:

RTC's motion for summary judgment (ECF No. 85) is DENIED as to Plaintiffs and as to RTC's claim against Continental for failure to provide insurance, and GRANTED as to the enforceability of Continental's obligations to indemnify RTC under the leasing agreements.

Continental's motion for summary judgment (ECF No. 86) is DENIED.

Plaintiffs' cross-motion for partial summary judgment against RTC is GRANTED.

An appropriate order accompanies this Opinion.

**CLAIRE C. CECCHI, U.S.D.J.**

DATED: October 23, 2017

---

[9] Continental does not argue Plaintiffs fail to raise a genuine dispute as to whether Continental breached its duty of care, and has not submitted evidence to show no such factual dispute exists.